*In re* HOFFMAN'S ESTATE.

HOFFMAN *v.* HOFFMAN.

1. APPEAL AND ERROR—JUDGMENT NOTWITHSTANDING VERDICT—REVIEW OF EVIDENCE.

On appeal from judgment for contestant notwithstanding verdict for proponent of will, where no motion for new trial was made, the controlling question is whether there was competent evidence to support the verdict that revocation involved was the result of undue influence or coercion.

2. SAME—DIRECTED VERDICT—REVIEW OF EVIDENCE.

In determining whether the court erred in entering judgment for will contestant on the motion for a directed verdict, the competent testimony and legitimate inferences to be drawn therefrom must be viewed in the light most favorable to will proponent.

3. WILLS—REVOCATION—WRITTEN STATEMENTS—UNDUE INFLUENCE—EVIDENCE.

Various statements of testatrix, made in letters to her grandson at various times within a period of from 5 to 40 days

prior to alleged revocation of will in which addressee had been named sole legatee, which indicated a solicitous attitude toward him and repeatedly complained of the conduct of her son with whom she was living and who was her sole heir at law, while admissible for consideration by jury on question of undue influence exercised by son upon his mother in procurement of revocation of will, *held*, insufficient to establish the fact of undue influence, or, standing alone, not to constitute evidence of undue influence.

4. SAME—REVOCATION—UNDUE INFLUENCE—EVIDENCE.

In probate proceeding where all legitimate inferences from testimony produced by proponent grandson fail to show testatrix was unduly influenced to execute the revocation in question, other evidence indicates she knew exactly what she was doing and lived three months thereafter in son's home apparently without worry or regret, trial court's holding as a matter of law that revocation was a valid one *held*, proper.

5. SAME—UNDUE INFLUENCE—MOTIVE—OPPORTUNITY.

Motive for and opportunity to exercise undue influence are not sufficient to establish undue influence.

6. SAME—UNDUE INFLUENCE.

Influence, to be classed as undue, must place a testator in such a position that his free agency is destroyed.

Appeal from Wayne; Webster (Clyde I.), J. Submitted October 9, 1941. (Docket No. 28, Calendar No. 41,696.) Decided February 11, 1942.

In the matter of the estate of Ella Hoffman, deceased. Henry Wade Hoffman presented for probate the last will and testament of deceased. H. Paul Hoffman filed objections thereto and presented a revocation thereof. Contest certified to circuit court. Judgment for contestant notwithstanding verdict for proponent. Both parties appeal. Affirmed.

*Dohany & Dohany*, for proponent.

*Miller, Baldwin & Boos*, for contestant.

BOYLES, J. The only question here is whether a certain instrument alleged to be the last will and testament of one Ella Hoffman has been revoked. More precisely the question is whether the writing claimed to be a revocation of the will was procured by undue influence. The will itself is not otherwise in question.

On September 16, 1939, the testatrix, Ella Hoffman, executed her last will and testament leaving all her property to Henry Wade Hoffman, proponent, and appellant herein (hereinafter called Wade Hoffman), naming him as executor. He is the only grandson of the testatrix and also the only son of H. Paul Hoffman who contests the will. Paul Hoffman in turn is the only son and heir-at-law of the testatrix and, therefore, would take the entire estate in the event of her dying intestate. Paul Hoffman claims that his mother, Ella Hoffman, subsequently revoked the alleged will of September 16, 1939, and died intestate. If his claim prevails, he succeeds to all of the property of Ella Hoffman as her sole heir-at-law; if not, his son, Wade Hoffman, takes her property by virtue of being the sole devisee and legatee in the alleged will.

On January 11, 1940, Ella Hoffman executed an instrument in writing purporting to revoke her will, and Paul Hoffman relies upon this alleged revocation to sustain his claim that Ella Hoffman died intestate. On the other hand, Wade Hoffman, who would take under the will if not revoked, claims that the alleged revocation was procured by undue influence and coercion, and the case hinges upon the proof adduced in that regard.

Ella Hoffman died April 17, 1940, at the age of 87 years, approximately three months after the alleged revocation was executed. Shortly thereafter, Wade Hoffman filed a petition to admit the alleged will

to probate and Paul Hoffman filed a notice of contest on the sole ground that the alleged will had been revoked by the second instrument hereinbefore referred to. Wade Hoffman thereupon filed a notice of contest against admitting the second instrument as a revocation, claiming that it had not been signed by Ella Hoffman, that it was a forgery, that if signed it was procured by undue influence and coercion, and that Ella Hoffman was mentally incompetent at the time the alleged revocation was executed. The probate judge certified the contest to the circuit court for hearing under the provisions of Act No. 288, chap. 1, § 36, Pub. Acts 1939 (Comp. Laws Supp. 1940, § 16289–1 [36], Stat. Ann. 1941 Cum. Supp. § 27.3178 [36]). The case was tried by jury. At the conclusion of the testimony, counsel for Paul Hoffman moved for a directed verdict on the ground that the first instrument had been revoked and that there was no competent evidence to show that the second instrument (the alleged revocation) was procured by undue influence or coercion. Decision thereon was reserved by the court under the Empson act, 3 Comp. Laws 1929, § 14531, amended by Act No. 44, Pub. Acts 1939 (Comp. Laws Supp. 1940, § 14531, Stat. Ann. 1941 Cum. Supp. § 27.1461), and the case was submitted to the jury on two questions of fact, (1) whether the alleged revocation was a forgery, and (2) if signed, whether it was procured by undue influence or coercion. Two special questions were submitted to the jury and were answered by the jury as follows:

"Question No. 1.

"Did Ella Hoffman sign the revocation of January 11, 1940?

"Answer. Yes.

"Question No. 2.

"Was the signing of the revocation of January 11,

1940, by Ella Hoffman the result of undue influence brought to bear upon her by H. Paul Hoffman and Marguerite Hoffman?

"Answer. Yes."

The will leaving the entire property to Wade Hoffman was declared to be the last will and testament of the deceased. Counsel for Paul Hoffman thereupon moved the court for judgment *non obstante veredicto* on the ground that there was no competent evidence to support the verdict that the second instrument was the result of undue influence or coercion. The two motions were brought on for hearing and were granted, the court finding as follows:

"It is my opinion that either I should have granted the motion and directed a verdict, or that now the judgment may be entered, notwithstanding the verdict of the jury, in favor of Paul Hoffman, on the ground that there is not sufficient testimony upon which a verdict can stand which holds that this revocation was secured through undue influence."

Judgment was entered accordingly, from which Wade Hoffman, the proponent for the will, appeals. No motion for new trial was made by Wade Hoffman and the controlling question is whether there was competent evidence to support the verdict that the revocation was the result of undue influence or coercion.

The testimony taken at the trial covers over 600 pages of printed record. In determining whether the court erred in entering judgment for the contestant on the motion for a directed verdict, the competent testimony and legitimate inferences to be drawn therefrom must be viewed in the light most favorable to Wade Hoffman. *In re Hayes' Estate,* 255 Mich. 338; *In re Lake's Estate,* 271 Mich. 675.

We have examined the record at length to ascertain the facts and the inferences to be drawn therefrom. Much of the testimony relates to the question whether the signature of Ella Hoffman to the revocation was a forgery and whether she was mentally competent at the time. These questions were submitted to the jury under proper instructions and are not now before us. The facts relied upon by appellant to establish that the revocation was induced by undue influence and coercion are substantially as follows: The relations between the testatrix and Wade Hoffman were friendly and continued so until her death; for some length of time before, and at the time of making her will, she intended to give all her property to Wade. She was not influenced to make the will and was of sound mind when it was made as well as when the alleged revocation was executed and for some time thereafter. Paul Hoffman and his wife were not always kind to the testatrix, found fault with things she did, and made her home unhappy for her. In the fall of 1939, Wade went to Florida and the testatrix kept up a correspondence with him. In these letters the testatrix told Wade of many things that Paul and his wife were doing and were saying to the testatrix against Wade. They were written between the date when the will was executed, September 16, 1939, and the time when the revocation was signed, January 11, 1940. Appellant summarizes the purport of these letters as follows:

"In exhibit 15-a, a letter from testatrix to Wade in her own handwriting, dated December 1, 1939, she expressed her desire to hear from Wade; in her letter, exhibit 16-a, postmarked December 15, 1939, to Wade, testatrix said she was pleased to hear from Wade and that he was well and safe, that he must take care of his health, and ended the letter with the

words 'Take care of yourself. With God Blessing, Your Grandmother.' In her letter to Wade, exhibit 17-a, postmarked December 17, 1939, testatrix expressed hope that Wade would not overdo, hoped he would have a good Christmas, and stated 'You have my best wishes and prayers every day;' in her letter to Wade, exhibit 18-a, postmarked December 23, 1939, she requested Wade to keep her posted where to address him, expressed pleasure over a picture of him which she placed on her desk, and further stated 'I look for your letters, a great comfort to me. Read them many times. I will write you Sunday. I will be alone all day. Best wishes;' in her letter to Wade, exhibit 19-a, postmarked December 25, 1939, testatrix told Wade of calling up his mother who came over and had a nice visit with testatrix. She concluded this letter with the following words 'Take care of yourself. I am looking *forward to your return.* You have my prayers and best wishes for you to have health and prosperous New Year.' This letter was sent by air mail.

"On January 6, 1940, when testatrix was very sick and weak, and didn't feel she could write, five days before the date of the alleged revocation, testatrix had the nurse write a letter to Wade in which she said 'I was indeed very delighted to hear of your success. It has made me feel very happy. Will help to make me get well. You have my very best wishes and my prayers,' which was signed 'your loving Grandmother.'

"Wade sent his grandmother letters, flowers and fruit and perfume from Florida.

"Testatrix mentioned her grandson, Wade, to the nurse, and said that she was very happy and pleased about his success as a boat captain in Florida. She seemed very fond of him. * * *

"Testatrix wrote to Wade, exhibit 19-a, on December 25, 1939, that Paul 'drinks too much.'

"In 1939 Paul bought a pleasure boat, a sleeping cruiser, upon which he intended to spend from Friday to Sunday nights, and Paul told testatrix that

she would have to stay alone or go with them on that boat. Testatrix wrote in her letter that she thought the boat was not for her, a woman of her age. She said 'no good would come of it.' However, Paul took testatrix out on the boat about a dozen times in 1939 to sleep on the boat and stay over night. * * *

"In her letter to Wade, dated December 1, 1939, exhibit 15-a, testatrix wrote concerning Paul: 'My son has very little to say to me. I speak to him when it is necessary;' in her letter, postmarked December 15, 1939, exhibit 16-a, testatrix wrote to Wade of Paul's abuse to her as follows: 'I can not tell you all, it was simply awful. And he said Wade is not any more a captain than I am, and one reason that he stays here is that he feels obligated to take care of me and that I am very ungrateful for all that he has done, which I had to hear. That what I had done for him was nothing' and further 'He said that he could take anything out of the home if he wanted to;' in her letter, postmarked December 25, 1939, exhibit 19-a (17 days before the date of the alleged revocation, exhibit 2), testatrix wrote to Wade as follows: 'Your father is better. The swelling has gone out of his hand. He does not take care of himself. Drinks too much. I have little to say to him. He has not been out of his mind lately. Marguerite is very disagreeable at times.' * * *

"On December 1, 1939, in exhibit 15-a, testatrix wrote to Wade as follows: 'Marguerite thinks that you neglected me shamefully. Then for me to make so much of you.'

"Again testatrix wrote to Wade, on December 13, 1939, exhibit 16-a, concerning Paul's acts, as follows: 'I asked your father (Paul) if he would read (Wade's letter). He took it but said nothing, but came back with it in his hand. *I cannot tell you that he said, only one thing that when you got any presents from me, he had to almost had to force you to telephone me your thanks.* And the I gave your mother. One thing was the chocolate set. He never

knew what became of it and other things. Then he said and you are talking to her over the telephone. *I cannot tell you all. It was simply awful and he said Wade is not any more a captain than I am.* And one reason that he stays here is that he feels obligated to take care of me. And that I am very ungrateful for all that he has done which I had to hear. That what I had done for him was nothing. Do not let this bother or *don't let him know that I have told you anything for it will make it very unpleasant for me.* He will never see any of your letters.' "

These letters were offered and received in evidence at the trial without objection, were used by appellee, Paul Hoffman, for cross-examination and to prove handwriting. On the argument before the court on the motions, counsel for appellee attempted to question the admissibility of these letters as follows:

"I believe that the point before the court, and it is the only point before the court that I know of, is the question of whether or not statements made by the testatrix in correspondence, which she addressed to Wade Hoffman, her grandson, are admissible in evidence on the question of undue influence as proof of what they state, or of the facts which they purport to state; in other words, as substantive proof."

The court correctly ruled that these declarations of the testatrix might be considered, but not to establish the fact of undue influence (*Zibble* v. *Zibble*, 131 Mich. 655), and further ruled that these letters standing alone did not constitute evidence of undue influence. This ruling was correct. *In re Estate of Reynolds*, 273 Mich. 71; *In re Livingston's Estate*, 295 Mich. 637; *In re Balk's Estate*, 298 Mich. 303.

After considerable testimony regarding the source of the property owned by testatrix, previous history of Paul and of his present wife, the rest of appellant's testimony may be summarized as follows: That testatrix was a very religious woman; that Paul kept intoxicating liquor in the home and used it too much, making it distasteful for her to live there, spent too much time entertaining customers and drinking, failed to turn over to testatrix the moneys due her from her husband's estate, improperly administered his father's estate as trustee, was unkind to his first wife (Wade's mother); that Paul didn't get along with Wade, had a hot temper, was abusive to testatrix at times; that testatrix kept to her own room as a prison; that the statements made by testatrix in her letters to Wade were true; much testimony about the physical condition of the testatrix, that she became quite ill 10 days before the date of the alleged revocation, was suffering from gall bladder trouble, uremia, arteriosclerosis, nephritis, senility, arthritis and heart trouble, that the nurse and doctor gave testatrix medicine to alleviate pain, that she was in bed and had a nurse in attendance. Appellant relates the circumstances under which the claimed revocation was executed January 11, 1940, as follows:

"On this same date, January 11, 1940, at the hour of 10 o'clock at night, Paul went into testatrix' bedroom, where she was bedfast, and said to testatrix, 'Have you given anything to Wade,' to which testatrix replied, 'He (Wade) is amply provided for,' and Paul said to testatrix, 'Well, what have you done?' Testatrix replied that she had made a will for Wade, and Paul said, 'Oh, you have.' Then Paul asked testatrix, 'Do you want to correct it?' so Paul and his wife, Marguerite, went out in the other room and Marguerite sat down and

took a piece of paper, and Paul dictated, and Marguerite wrote exhibit 2, which is the alleged revocation. Then Paul and Marguerite together came back into testatrix' bedroom with this paper, and Paul sat down on the edge of the bed and Paul said to testatrix 'Do you want to sign this?' Paul then turned to the nurse and said 'Get the pen and something for her to write on.' Testatrix was sick at that time, bedfast, and had been bedfast ever since she first took sick about the 1st of January, 1940. She had been right down flat on her back all that time. Marguerite propped testatrix up in bed so she could sign the instrument, exhibit 2. Paul didn't explain anything to testatrix. Testatrix was quite deaf, very hard of hearing. Paul told testatrix where to sign. Then they laid testatrix back again, and she reclined, sort of sighed and said: 'Well, now, maybe I can sleep tonight,' 'Now, perhaps I can get some sleep.' ''

Appellant further showed that after January 1, 1940, Paul and his wife prevented others from seeing and conversing with the testatrix, Paul's wife was constantly present when anyone did talk with testatrix, that some friends, alleged to be friendly to Paul and his wife, were permitted to see the testatrix during this time; that Paul failed to notify Wade of his grandmother's death. Testatrix lived three months after the revocation was executed, and the nurses and others testified she slept better, her mind seemed relieved.

The circuit judge, in granting the motion for a directed verdict reserved under the Empson act, said that the letters which appellant claimed to show undue influence on the part of Paul Hoffman tended to show, on the contrary, reasons why the testatrix might be influenced against Paul rather than in his favor; that the inference to be drawn from proponent's entire testimony was that testatrix was

more likely to be influenced in favor of Wade than otherwise. The court found testatrix was fully competent to execute the revocation, that the inference to be drawn from all the testimony was that she felt she had made a mistake in leaving her property to her grandson rather than to her son, that it worried her, and that she and no one else changed her mind in that regard.

In this conclusion, we concur. If the testatrix thought she had committed a wrong, she had a right to correct it and her correction of it must stand unless she was unduly influenced to execute the revocation. All legitimate inferences from proponent's testimony fail to show that she was unduly influenced to execute the revocation or that it was not her own free act and deed willingly and voluntarily done. The circumstances under which the revocation was signed on January 11th in themselves negative any legitimate inference of undue influence. Witnesses to the instrument testified that it was read to her carefully and slowly, and that she knew exactly what she was doing. There is no testimony that during the three months she lived thereafter she was worried or sorry. In fact, the testimony is the opposite, she stopped worrying, was able to sleep, and her mind seemed to be at ease again. The merits of the controversy between her son and her grandson as to which one was more entitled to be her beneficiary are not for the jury nor for the court to decide. As usual in these cases, the testimony largely contemplates a determination of the equities between proponent and contestant, rather than whether the testatrix was unduly influenced to revoke her will.

Proponent's testimony unquestionably shows motive for and opportunity to exercise undue influence. This is not sufficient to establish undue

influence. *In re Hayes' Estate, supra.* Influence, in order to be classed as "undue," must place the testator in the attitude of saying "It is not my will, but I must do it." The coercion or compulsion must be such that free agency is destroyed. The dominating mind of another must dictate what the testator shall do and compel him to adopt the will of another instead of exercising his own. The facts may show that he was advised, persuaded, solicited, importuned or entreated, but, so long as he is not rendered incapable of acting finally upon his own motives and so long as he remains a free agent, his decision is his own and the action is his own and not that of another. *In re Williams' Estate,* 185 Mich. 97; *In re McIntyre's Estate,* 193 Mich. 257; *In re Balk's Estate, supra.*

Judgment is affirmed, with costs to appellee.

CHANDLER, C. J., and NORTH, STARR, WIEST, BUTZEL, BUSHNELL, and SHARPE, JJ., concurred.