In the Matter of the Estate of PETER STEGMAN, Deceased.

Surrogate's Court, Oneida County, March 25, 1929.

*Southworth & Malone* [*M. Francis Malone* of counsel], for the proponent.

*Edward L. Smith*, for the contestant.

*George E. Philo*, special guardian for minor child.

EVANS, S. Mr. Peter Stegman resided at 1539 Miller street, Utica, N. Y., when he died on September 26, 1928. He was about seventy-five years of age and was born in Germany but had lived in Utica for many years. He owned the double house on Miller street, leasing the one flat, and the other was occupied by a daughter, Mrs. Richardson, and her family with whom the decedent lived. His wife predeceased him, and he left as his heirs at law and next of kin two sons, two daughters and a grandson, named George Stegman, a minor child of a deceased son of the decedent.

There are now on file in the office of the surrogate three instruments purporting to be wills of the decedent.

The dates of these instruments are December 24, 1923, May 31, 1927, and September 23, 1928.

Proceedings are now pending to probate the instrument bearing the last mentioned date.

For convenience the instruments on file will be referred to in the order of their dating as the first, second and third wills.

The real property is incumbered and the value of the equity is placed at $4,000. The value of the personal property is estimated at $2,300.

George Stegman, a son of the decedent, is named as executor in each will. He is contesting the probate of the third will now under consideration.

The first will directs that all real and personal property be converted into cash and equally divided between the four children and the grandchild of the testator.

The third will disposes of the property in the same manner as the first will.

The second will devises to the son George the house on Miller street, subject to the incumbrance and to be in full satisfaction of any obligation owed to George by the testator. The other son, Arnold Stegman, is relieved of paying a promissory note for $300, with interest, that the testator held against him. The residue is to be divided between the two daughters and the grandson mentioned.

The first and second wills were drawn by his attorney and each bears the signature of the testator in what may be styled a plain heavy hand.

The third will bears no signature of the testator excepting a wavering cross mark.

The witnesses to the third will are Anna J. Madden, the nurse who cared for the testator, and his son-in-law, with whom he lived, named Charles Richardson.

The contestant claims that the third will was never executed by the decedent and was prepared after his death.

There is no direct proof of this allegation, but certain incidents and circumstances are shown that the contestant asserts brand the third will as fraudulent.

The issue involved was tried before the surrogate without a jury. The first and second wills were in possession of the attorney who prepared them until after the death of the testator.

The third will was prepared by the attending nurse, whose name appears as a witness. She testified among other things that she had drawn several wills for patients. This practice for a nurse is unwise and such excursions into the field of law should be discouraged. The relation between patient and nurse is highly confidential. Under such conditions the opportunity for fraud and undue influence is too great for safety. The old adage that " a shoe-

maker should stick to his last " still has its application. The drafting of wills had better be left to the legal profession.

It is well settled that the signature by a mark is sufficient as a subscription within the meaning of section 21 of the Decedent Estate Law. (*Jackson* v. *Jackson,* 39 N. Y. 153.)

This manner of execution is not rare but it is unusual, however, for a person to sign by a mark who is able to write. This fact in itself does not invalidate a will but it is obvious that it calls for great scrutiny on the part of a court.

" Before admitting a will to probate, the surrogate must inquire particularly into all the facts and circumstances and must be satisfied with the genuineness of the will, and the validity of its execution." (Surrogate's Court Act, § 144.)

The burden of proof to establish the genuineness of a will is on the proponent. (*Howland* v. *Taylor,* 53 N. Y. 627.)

A will bearing a cross mark as the signature of a person able to write received attention in *Matter of Irving* (153 App. Div. 728).

That will was admitted to probate and the decree sustained by a divided court with a strong dissenting opinion. The prevailing opinion among other things announced the rule in such a case as follows: " Where one who can write has not signed his name to his will, but has instead thereof made his mark, and those taking substantial interests under the will are instrumental in obtaining it, while other interested persons act as witnesses to the signature, clear and satisfactory evidence is required to meet the burden of proof, and if the circumstances are not satisfactorily explained they may justify a conclusive presumption that the mark is not the subscription of the testator."

In an ordinary case of a disputed signature it is possible to compare and analyze handwriting by the use of conceded standards. A mere cross mark prohibits and makes impossible this testing of proof.

The decedent became ill on Thursday, September 20, 1928, and the nurse who lived in the immediate neighborhood was called in on the case. According to the testimony, the patient had pneumonia and the next morning between six A. M. and seven A. M., while it was yet dark, he asked his daughter, Mrs. Richardson, to draw his will, but she replied that she could not, but that she believed the nurse might do it. Accordingly Miss Madden procured a nurses' chart and on one sheet wrote what the decedent told her, with a lead pencil. He then sat up in bed and made a cross mark on the paper and after declaring the instrument to be his last will and testament he requested the nurse, Miss Madden, and his son-in-law, Charles Richardson, to sign as witnesses, which they did,

in the presence of each other. The nurse then retained custody of the instrument until after the death of the decedent on September 26, 1928, when it was turned over to the possession of Mrs. Richardson. The nurse testified that, at a preliminary examination of attesting witnesses, she and Mrs. Richardson had been good friends many years and were girlhood pals.

This witness at the trial denied the existence of close friendship and classed the Richardsons as neighbors.

Taken as a whole, I think that the evidence shows that the third will is supported only by testimony of highly interested witnesses. This fact, in itself, does not necessarily excite suspicion but it does impose upon a court the duty of weighing and testing all other incidents and surrounding circumstances in connection with the transaction. We have here a bare recital by interested witnesses accompanied by a paper purporting to be a will bearing a cross mark for the signature of the alleged testator.

There is no evidence whatever that Mr. Stegman on any other occasion ever signed with a mark.

The claim that he was too weak to sign his name is flatly contradicted by the physician in charge, who was a witness for the proponents.

The doctor testified that in his opinion the decedent had strength enough to write at any time during his illness to the day of his death. When the third will is said to have been executed the decedent had been ill about twelve hours and lived nearly a week thereafter. The nurse testified that for practically a week she had no sleep whatever. There appears to have been no reason or excuse for such heroic service and the tale seems to me incredible and fantastic. The mind of the decedent was clear nearly to the time of death. The first and second wills were drawn by his attorney. During a spell of illness, the decedent sent for his attorney to come to the house and the first will was executed there. He evidently appreciated the importance and formality of a will.

It would require a radical change of mind and habit for the decedent to be satisfied with a will drawn by an employee at daybreak on a sheet designed for another purpose, with a lead pencil and signed with a cross mark. While this state of mind might be the result of a passing whim I think that it must be included among the improbabilities disclosed at the trial.

Another incident occurred that fails to harmonize with any reasonable theory in support of the disputed document. The decedent died at about one-ten A. M. on Wednesday. Before his arrival about nine A. M. that same day, Mr. and Mrs. Richardson were waiting for the attorney who had in his possession the first

and second wills. Mrs. Richardson informed the attorney of the death of her father that morning and asked if she might have his will. She was told that she might have copies but not the originals. The existence of the first will was of course known to the callers, but the second will was not. This caused surprise and indignation on the part of Mrs. Richardson, and the evidence is that she became angry and spoke in loud tones and demanded why she had not been notified when the second will was executed and volunteered the opinion that it was work of the attorney and her brother George to cheat her out of her rights. She also inquired how long it would be before she could get some money and also wanted to know "when the will would be read," referring to the second will. The attorney prepared and delivered to her copies of both wills. The following Friday Mrs. Richardson telephoned to the attorney and repeated her question as to when the will would be read.

It is the theory of the contestant that the third will was drafted from a copy of the first will that had been delivered to Mrs. Richardson. The phraseology of the third will is substantially the same as the first in so far as it directs the disposition of property, but this is a feature susceptible of debate and I think not essential in deciding the issue. Mrs. Richardson testified that she had in her possession the disputed document while she was at the attorney's office and made no mention of the fact.

There is no dispute of what transpired at the law office. The proponents have produced direct testimony in support of the third will.

The contestant challenges the truth of this testimony largely by circumstances. A court is not bound to adopt the statements of a witness simply for the reason that no other witness has denied them. The witness may be contradicted by circumstances as well as statements of others, contrary to his own, or there may be such a degree of improbability in his statements as to deprive them of credit however positively made. (*Koehler* v. *Adler*, 78 N. Y. 287.)

The significance of acts of normal persons must be judged according to established standards of human conduct.

If the third will was in fact executed by the testator at the time and in the manner described it revoked and nullified all prior wills.

The old wills in the possession of the attorney became void and of no value. What then was the moving cause that took Mr. and Mrs. Richardson to the office of the attorney early in the morning, following the decedent's death? Why this haste and evident anxiety if we are to believe that Mrs. Richardson then had the third will and the only one having legal vitality? Would the disclosure of the second will stir up anger and excitement under the

circumstances?  If we are to adopt and credit the testimony of the proponent this second will was as obsolete as a last year's bird's nest.  The first knowledge of it might create surprise but not sustained anger.  There would naturally be a grim satisfaction that her brother George had been outwitted.

The question asked of the attorney about when the second will would be " read " cannot be reconciled with the claim that a third will was in existence.  The further inquiry about when the legatees would receive their money was a tacit recognition of the second will accompanied by the implication that the attorney would be concerned in the distribution of the estate.

The silence about a third will while the first and second will were being read and discussed was strange and unnatural.

In my opinion the proponent has not only failed to sustain the burden of proof in this proceeding but the evidence convinces me that the instrument bearing date September 23, 1928, designated as the third will, is fraudulent and void.

It must, therefore, be held and decided that the instrument under consideration is not the last will and testament of Peter Stegman and that he did not execute it.

Probate is denied.

Decreed accordingly.